Shirley BAILEY et al.

v.

Robert J. LALLY, etc., et al. (K–74–1102)

James Allen DINGEE

v.

Robert J. LALLY, etc., et al. (K–75–1370)

Thomas John NEUSER

v.

Robert J. LALLY, etc., et al. (K–75–1371)

Edward Smith MUNNEY, Jr.

v.

Robert J. LALLY, etc., et al. (K–75–1372)

Civ. Nos. K–74–1102; K–75–1370; K–75–1371 and K–75–1372.

United States District Court, D. Maryland.

July 21, 1979.

Matthew L. Myers and Peggy A. Wiesenberg, The National Prison Project of the American Civil Liberties Union Foundation, Washington, D. C., and Judith Fournelle, Baltimore Legal Aid Bureau, Baltimore, Md., for plaintiffs.

Stephen H. Sachs, Atty. Gen., and Steven P. Resnick, Asst. Atty. Gen., Baltimore, Md., for State defendants.

Gordon G. Power, Towson, Md., for defendant Theodore Woodard.

John F. King and E. Dale Adkins, III, Baltimore, Md., for defendants Hornick, William Woodward and Gilman.

FRANK A. KAUFMAN, District Judge:

Plaintiffs in Civil No. K–74–1102, current and former state prisoners, initiated this class action under 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3), on behalf of all prisoners who were incarcerated at the Maryland House of Correction (MHC), a medium security penal institution, on or after December 7, 1973, and who participated in any medical research tests in the Medical Research Unit (MRU) of the MHC.[1] Defendants are prison administrators, officials of the Universi-

---

1. Named plaintiffs, as class action representatives, originally sought equitable relief. However, from the start, named plaintiffs, as individuals, asserted claims against defendants in the latter's individual and representative capacities for compensatory and punitive damages. After a (b)(2) class had been certified, plaintiffs' equitable claims were dismissed as moot because the MRU was closed in January 1976 and defendants committed themselves not to engage in any similar prisoner experiments prior to enactment of federal legislation or a final decision of the Supreme Court, the Fourth Circuit or this Court. Thereafter, named plaintiffs sought to pursue class action damage claims and their petition for Federal Civil Rule 23(b)(3) class certification was granted.

ty of Maryland and the University of Maryland School of Medicine under whose auspices the medical research was sponsored, and doctors on the faculty of the University of Maryland School of Medicine who were responsible for conducting the research studies at the MRU.[2] Presented herein, in a non-jury trial, after the disposition of other issues,[2A] is the issue of whether conditions of incarceration at the MHC were so bad and the inducements to participate in the MRU so great that the prisoners' participation in the medical research program was not voluntary and therefore in violation of constitutional rights to due process, privacy and protection against cruel and unusual punishment. Many of the facts were stipulated. Others are determined herein following trial.

### Findings of Fact

The MHC was opened in 1879. Various additions and new facilities have been since incorporated. Conditions at the institution often have been the subject of controversy; certain of those conditions related to overcrowding have been declared unconstitutional. *Johnson v. Levine,* 450 F.Supp. 648, 650 (D.Md.), *aff'd in relevant part,* 588 F.2d 1378 (4th Cir. 1978) (en banc) (per curiam).

The design capacity of the MHC is approximately 1100. The population of the MHC on January 1 during the years 1971 to 1975 ranged from 1498 to 1617. Approximately 978 prisoners were housed two men

to a cell at any one time from 1971 through 1975. The cells which housed two men measured about 40 square feet and were designed for one person.[3] There were sometimes time-consuming problems in finding compatible cellmates. Prior to 1976 there was no hot water in the cells at the MHC. Heat in the winter was inadequate and the institution was very hot in the summer. The building suffered from lack of repairs; the environment has been described as dreary and some have characterized the living conditions as barbaric. Overcrowding resulted in an excessive noise level, sanitation problems, and adverse psychological effects, including increased stress, anxiety and fear. *Johnson v. Levine, supra,* 450 F.Supp. at 655.[4] On January 1 of the years 1971–75, the percentage of prisoners on idle status ranged from 16.2% in 1971 to 37.3% in 1974 to 18.5% in 1975. Prisoners on idle status or undergoing job classification did not have a job, educational or vocational assignment, spent between 16 and 17 hours per day in their cells, and were otherwise restricted as to the activities in which they participated. Prisoners with jobs spent approximately 10 hours per day in their cells. Prisoners with jobs (either institutional or State Use Industries) earned, as of April 1975, between $0.63 and $1.46 per day with the exception of those prisoners working in the laundry who earned $2.22 per day.[5] Prior to 1974 prisoners attending the educational program were also allowed to maintain an in-

2. Originally, a number of high federal and state officials were named as defendants in one or more or all of these cases. The complaints against them have earlier been dismissed for reasons previously stated on the record by this Court.

The cases other than Civil No. K–74–1102 have been consolidated for all purposes with that case. All quests for equitable relief in all of the cases have become moot. *See* n. 1 *supra.* Judgments for defendants in all cases, insofar as damages therein are sought, will be entered for defendants for the reasons set forth in this opinion.

Plaintiffs in one or more or all cases have stated common law negligence as well as constitutional claims. Because of this Court's denial of all of plaintiffs' claims on the constitutional issues, this Court will not exercise its pendent jurisdiction over any of the common

law claims. *See Sigmon v. Poe,* 564 F.2d 1093, 1096 (4th Cir. 1977) (per curiam).

2A. *See* nn. 1 and 2, *supra.*

3. Between 1971 and 1975, prisoners in the general population were also housed in four dormitories.

4. *See* Reports of Grand Jury for Anne Arundel County, March Term 1972 at 41, March Term 1973 at 28–29, September Term 1973 at 27; September Term 1974 at 19.

5. The additional pay in the laundry was attributable to a pilot program begun in September 1972 entitled Operation Bootstrap which provided a salary bonus of $0.60 to $1.10 per day for some 85 prisoners.

stitutional job but were not paid for their participation in the educational program. After 1974, prisoners in the educational program were paid $0.70 per day but were not permitted to maintain a job. Most jobs and educational programs were active only 5 days per week; about 85 percent of the prisoners who worked earned less than $1.10 per day.[6]

Money earned by a prisoner was used by him to buy items at the commissary not regularly provided to prisoners, to save, or to send home. Indigent prisoners, those with less than $2.00 in their prison accounts, were given certain basic items such as toothpaste and shaving cream which were available to others only for purchase at the commissary. All prisoners were permitted to receive money from outside sources.

Medical research involving prisoners in the MHC started in 1958. The medical research unit (MRU) at the MHC was established by doctors on the staff of the University of Maryland School of Medicine, Division of Infectious Diseases. Between 1971 and 1976, Dr. Richard Hornick, Professor of Medicine and Chief of the Division of Infectious Diseases, was responsible for the MRU and also the principal investigator in many of the experiments conducted. The MRU was approved by prison administrators at the state and institutional level. When the MRU was formed, the then Commissioner of Corrections of the State of Maryland determined that prisoners should be paid for their participation in medical research projects, and set the rate at $2.00 per each day, including any Saturdays or Sundays if an experiment spanned such a day. That rate of pay was recognized as higher than the average prison wage, and as an inducement. The $2.00 per day rate remained constant through 1976 until the MRU was closed.[7] At the outset, it was determined by those in charge that participation in the MRU by any prisoner would have no impact upon any decision regarding his parole.

Some of the studies conducted at the MRU required prisoners to "live in" as patients in a specially designated section of the MRU; other studies were conducted on prisoners who remained in their cells. The former can be described as in-patients, the latter as out-patients. Approximately two-thirds of the prisoner participations (number of prisoners participating times number of times each participated) during the relevant period of time were out-patient participations. The percentage of prisoner volunteers on idle status prior to becoming volunteers ranged from 5.7% in 1971 to 35.2% in 1975. Twenty-nine percent of the volunteers on idle status became in-patients as compared to 20 percent of the volunteers with jobs who became in-patients. After 1972, prisoners on in-patient studies or those on out-patient studies who became sick and had to be admitted to the MRU for treatment lost their right to return to their same cells or dormitories and their right to retain their jobs. A prisoner on an out-patient study could retain his cell and his job, if he had one. Thus, prisoners on out-patient studies could supplement job income and obtain additional time outside their cells.

The MRU live-in section contained 34 beds, which were generally 70–75 percent occupied. The unit was air conditioned, adequately heated, and quiet. It had hot water at all relevant times, color television, and three separate bathroom facilities. The new MRU facilities were opened in 1972 and complied with all relevant public health regulations. Prisoners participating on in-patient studies and confined to the MRU

---

6. Some prisoners seemingly were able to obtain additional money through "hustles" or transactions involving other prisoners.

7. Prisoners also received one to five dollars additional pay for various medical procedures necessary for a study, e. g., being subjected to mosquito bites in order to expose the subject to malaria.

had certain advantages: "[T]he physical set-up . . . is considered superior in many ways to the normal correctional situation. Not only is the volunteer free to do as he wishes, but he associates with persons who are not inmates nor guards and has a definite break in routine."[8]

Prisoners found out about the MRU through several methods, including word of mouth.[9] Participation by prisoners in the MRU was initiated by application.[10] Application forms were published in the prison newspaper and, during some periods, those forms were given to prisoners when they entered the MHC. There was no other solicitation of volunteers. The defendant doctors testified that there was always a shortage of volunteers and that some studies had to be aborted because of insufficient volunteers. On the other hand, those who did volunteer seemed generally willing to participate again, usually, apparently, because the prisoner who volunteered wanted to make the extra money.

Application forms were initially reviewed by the Assistant Warden for Treatment, and then forwarded to the MRU for holding until the next study was ready to be commenced. When that time arrived, the MRU (male) nurses reviewed applications and called in the prisoner volunteers. Either a nurse or the doctor in charge of the study would speak to the prisoners as a group about the study in general, including reasons for the study, the nature of the experi-

---

**8.** Memo for Record, Visit to Maryland House of Correction, Department of the Army, Plaintiffs' Ex. 50 at 2. *See also* deposition of Gary Lee Sabatini, Sr. at 58–59.

**9.** An information sheet for prisoners contained the following description of the studies conducted in the MRU:

### VOLUNTEER STUDIES

For almost 15 years now volunteer studies have been carried out at the House of Correction by doctors from the University of Maryland and the National Institutes of Health. From these studies we have learned a tremendous amount about diseases which affect most of the world. These have included the common cold, flu, malaria, and different types of diarrhea. All of these diseases only occur in man. They don't occur in monkeys or mice or any other animal. Therefore they can only be studied effectively in man. As we have learned more and more about these illnesses we have been able to develop better ways of treating them. But even more important, we have been able to make better vaccines that prevent the disease from ever happening. Some of the new vaccines that have been tested at Jessup are now being used in the United States and all over the world. This would not have been possible without the cooperation of hundreds of volunteers over the years.

When we say volunteer studies, we mean just that. You are volunteers. You are not forced to do anything. If you apply to be on a study and then later on you want to drop out, you can do it. It won't go on your record and you can apply for another study at any time. You can even drop out in the middle of a study. It is your choice. You can choose the kind of study you want to be on. For example, you can choose a so-called "walking test" where you are not admitted to the hospital and you won't risk losing your job.

Above all, you are not guinea pigs. We will explain every study to you at least twice before it starts. This means we will tell you why we are doing the study, what exactly is going to happen, and what risks are involved. If you have any questions, we will answer them. There will be no operations or special tests that would be hard on you. Every study has to be approved ahead of time by a special committee at our university.

We feel that all this is important, especially because some of you have been worried in the past. None of the studies will make you sick for a long time or sterilize anyone or do any of the things that get spread around by rumors. Some of you may get sick, but we will provide early and complete medical care. In 15 years of these studies we have never had a serious complication.

If you want to join, fill out the application. The assistant warden's office will approve it if you are at least 21 years old. Then we will call you down to our ward and explain the studies to you, including how much we pay for each study.

**10.** A standard application form requested the following information:

ment, and possible hazards.[11] If the prisoner indicated he was interested in taking part in the study, he would then be given a physical examination. Repetitive oral explanations, including questions and answers, were given to the volunteers in layman's language.[12]

## MARYLAND HOUSE OF CORRECTION, JESSUP, MARYLAND

### INMATE APPLICATION FORM FOR INFECTIOUS DISEASE STUDIES

YOU MUST MEET THE FOLLOWING REQUIREMENTS BEFORE YOU ARE ELIGIBLE FOR CONSIDERATION FOR THE TEST PROGRAMS:

1. An Officer must witness the signature of the Applicant.
2. Applicant must be 21 years of age or older, where there is doubt of age, applicant must furnish necessary proof.
3. Any inmate that has escaped from maximum security will not be permitted to participate.
4. An inmate must be off all previous studies for at least six (6) weeks before he is eligible for another study.

YOUR FULL NAME _____ NUMBER ____ RACE ____ AGE ____ BIRTHDATE

LENGTH OF SENTENCE ____ MOUNT OF TIME LEFT ____ QUARTERS ____ ASSIGNMENT

REASON FOR WANTING TEST: _____

OFFICER'S SIGNATURE _____ DATE _____ VOLUNTEER'S SIGNATURE

ADDRESS ALL APPLICATIONS TO: Mr. M. Moore, Assistant Warden-Treatment. Drop application in your housing area mail box.
*************************************************************************************

NOTE: Volunteering for a medical study may affect your present job. If you take part in a study in which you are seen each day and not admitted to the research ward (Walking Study), this will not affect your job. However, if admitted to the research ward you will lose your current job. As soon as you are discharged from the ward, an attempt will be made to furnish you with a job similar to the one you had prior to the test. No guarantee can be made to restore your old job. Return to a job should be prompt, i.e., within several days. This statement does not apply to those men enrolled in the Bootstrap Program in the laundry.
*************************************************************************************

DO NOT WRITE IN THIS SPACE

APPROVED

ASSISTANT WARDEN TREATMENT

This application is for participation in studies in the Maryland House of Correction "ONLY". It does not apply to any studies in the University of Maryland Hospital.

11. Two examples of the type of consent information apparently used by Dr. Hornick are the following. The second example contained the introductory proviso: "This in no way represents the full explanation given the volunteers."

Protocol: "Study of Shigella Vaccines in Man"
In these diarrheal studies the hazards and symptoms of each disease are explained in detail to the volunteers before the study is begun. They are told they may develop severe diarrhea, abdominal cramping, bloody mucoid stools or high fever. The volunteers may withdraw at anytime and specific antibiotic therapy is available.

Protocol: "Intestinal Biopsy Studies of Volunteers with Acute Non Bacterial Gastroenteritis:
You may develop acute "viral diarrhea". You may have fever, abdominal pain, diarrhea and vomiting. If you agree we would like to obtain a small piece of small or large intestine. On rare occasions following such a procedure small amounts of intestinal bleeding might result and even more rare is the occurrence of intestinal perforation which might require blood transfusions and surgery.

12. The Procedures Manual for Research Involving Human Subjects, University of Maryland

The most common question raised by prisoners involved their pay for participation. Other questions concerned retention of jobs, cell arrangements, visitation rights, and disease-related questions such as whether the disease would be contagious. Some doctors specifically told the inmates as part of the oral explanations that participation by an inmate would have no impact on parole. Other doctors did not volunteer that infor-

School of Medicine, June 1971, contains the following:

Full disclosure and informed consent

Informed consent is the agreement obtained from a subject, or from his authorized representative, to the subject's participation in an activity.

The basic elements of informed consent are:

(1) A fair explanation of the procedures to be followed, including an identification of those which are experimental;

(2) A description of the attendant discomforts and risks;

(3) A description of the benefits to be expected;

(4) A disclosure of appropriate alternative procedures that would be advantageous for the subject;

(5) An offer to answer any inquiries concerning the procedures;

(6) An instruction that the subject is free to withdraw his consent and to discontinue participation in the project or activity at any time.

In addition, the agreement, written or oral, entered into by the subject, should include no exculpatory language through which the subject is made to waive, or to appear to waive, any of his legal rights, or to release the institution or its agents from liability for negligence.

Informed consent must be documented. The following checklist was used to each experiment to make certain that all preliminary items were covered. The record discloses that in some instances certain blank spaces on the checklist were not initialed.

DATE: _____

NAME: _____ # _____ LOC. _____ WORK _____

FINAL CHECK LIST

"MUST BE COMPLETED BEFORE ANY CHALLENGE OR STUDY IS BEGUN"

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NURSE: 1. Explained study to voluntee [sic]. _____ Initialed

2. Permission sheet signed by volunteer. _____ Initialed

3. History taken and recorded. _____ Initialed

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PHYSICIAN:

1. Normal history and physical. _____ Initialed

2. Norman [sic] E.C.G. _____ Initialed

3. Normal chest X-Ray. _____ Initialed

4. Appropiate [sic] blood studies are within normal limits. _____ Initialed

5. Permission sheet examined and signed by Doctor after he explains the study and pay scale schedule to volunteer. _____ Initialed

6. Okay to challenge: _____ Signature _____ Date

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NURSE IN CHARGE:

Permission to challenge is granted: _____ Signature

_____ Date

mation but did reveal it in answers to questions by the prisoners.

For various reasons some volunteers would not be accepted for a particular study. Those accepted were again told what they should expect while on the study and were again asked if they wanted to be on the study and told that they could withdraw without any adverse consequence if they so desired. Many did withdraw for various reasons and at various stages both before and during a study.[13] One doctor (Dr. Gilman) characterized attrition as "out-of-sight."

The doctors considered a written consent form insufficient and relied on the repetitive oral explanations to inform the prisoners, though at some time after the initial oral explanation the volunteer would be asked to read and sign a written consent form similar to a standard hospital consent form.[14] From and after June 1971 the Uni-

13. Thus, for example, in a typhoid study in which volunteers who have received a vaccine are then administered live organisms to challenge the effectiveness of that vaccine, some would drop out before being vaccinated, others before receiving the live organisms, and one inmate dropped out after receiving the challenge.

14. The following types of consent forms were used. The shorter type was the first generally used; the second more detailed form was sometimes used. The doctor in charge of a particular experiment apparently adopted and varied the form used so as to relate it, on some occasions, to the individual characteristics of the experiment itself.

CONSENT FORM

MARYLAND HOUSE OF CORRECTION
UNIVERSITY OF MARYLAND, SCHOOL OF MEDICINE
DIVISION OF INFECTIOUS DISEASES
BALTIMORE, MARYLAND.

VOLUNTEER'S NAME: ROBERT MCGEE NUMBER: 114 290

PROJECT TITLE: TYPHOID # 54 Vaccine

This is to certify that I, Robert McGee hereby agree to participate in a program of study under the care and supervision of Dr. Dupont . I understand these studies will involve the following special procedures: Swollow four doses of typhoid vaccine which may cause cramps and watery diarrhea.

I hereby authorize Dr. Dupont and such assistants as he may designate to perform these procedures and any other diagnostic and/or therapeutic procedures which, in their judgement, become necessary while I am participating in the study.

I have been further advised that unforeseen results may occur and never the less, hereby authorize Dr. Y Dupont and such assistants as he may designate to perform these procedures upon me, and hereby release and forever discharge him, such assistants, the University of Maryland, its officers, agents, and employees, and all persons on its medical and surgical staff who are in any way connected with the procedures, from liability for any injury which may result directly or indirectly from the performance of these procedures. I

understand the nature and purpose of the procedures described above and such risks as are involved in their performance.

_7-3-71_
DATE:

_Robert M McGee_
SIGNATURE OF VOLUNTEER:

_R McGee_
WITNESS

I have fully explained to the volunteer _Robert McGee_ the purpose of the procedures described above and such risks as are involved in their performance.

_7/6_

PHYSICIAN'S SIGNATURE:

UNIVERSITY OF MARYLAND
SCHOOL OF MEDICINE
DIVISION OF INFECTIOUS DISEASES
29 SOUTH GREENE STREET
BALTIMORE, MARYLAND 21201

Consent Form for Dysentery (Shigella) Challenge
University of Maryland School of Medicine and Hospital
Baltimore, Maryland

Patient Name: _Robert McGee_
Project Title: _Shigella #108_

This is to certify that I, _Robert McGee_, agree to participate in the following program of study under the care and supervision of Dr. _Woodward_.

I understand that I am participating in a study of shigella dysentery vaccines. To prove that the vaccine is effective, I will take by mouth _200_ shigella germs which have been mixed in milk. Afterwards I realize that I have a _25_ % chance of becoming ill within 1-5 days.

I understand that I may develop frequent diarrhea which may be mixed with blood and mucus. I also may have stomach cramps, headache and muscle aches, nausea, vomiting, chills, and fever. If I become ill, I will be admitted to the hospital and treated with an effective antibiotic, which should make me feel considerably better within 2 days. I also understand that the illness may return within a few days. If this happens to me, I will again be hospitalized and treated with an effective antibiotic.

Whether or not I become sick, I will give a stool specimen or rectal swab and have my temperature checked daily for at least 2 weeks. In addition, small amounts of blood will be drawn from my arm vein every 2 weeks for 8 weeks.

I understand that dysentery, when it is properly treated, is rarely a serious illness in adults. Since 1966 at Jessup, there has never been a major complication of this illness in any volunteer. If one were to develop, however, I would be fully cared for.

I authorize Dr. _Woodward_ and such assistants as he may designate to diagnose and treat any illness or side effect related to the study which occurs while I am participating in the study.

versity of Maryland required that the consent forms should not contain any exculpatory language waiving liability for negligence or releasing that institution or anyone else.

The MRU conducted nontherapeutic studies involving various infectious diseases.[15] With the exception of the common cold and flu, there were known cures for all the infectious diseases studied. Doctors in the field of course do not usually know in advance the disease which they will encounter. In the MRU the doctors knew which disease had been administered to a volunteer and could thus diagnose and treat it at a very early stage if the volunteer developed symptoms of the disease.

The MRU was not a unique facility. Similar facilities conducting similar tests on prisoners were operated in numerous other states.[16] Similar studies were still in being when the trial of this case was commenced in January 1979 at prisons in Jackson, Michigan; Deer Lodge, Montana; and Vacaville, California.

The MRU research studies were largely funded by federal agencies after submission to and review by those agencies of protocols describing all aspects of the proposed research. The principal sponsor was the United States Department of Health, Education and Welfare (HEW) and the United States Department of the Army.[17] There

I fully understand the study and the procedures which will be performed. I have had an adequate chance to ask questions. I have not been forced in any way to take part in this study. I may withdraw from the study at any time without any action being taken against me. Nothing will be placed on my record, and I will be able to volunteer for any future studies. If I do withdraw from the study, this will not limit my opportunity to receive medical services offered by the University of Maryland Hospital other than those which are a part of this study.

_6/27/74_
Date

_Robt of myc Ghee_
Signature of patient or authorized
representative

I have fully explained to the volunteer, _Robert McGee_, the natur and purpose of the procedures described above and such risks as are involved in their performance.

_6-27-74_
Date

_W R Woodward_
Physician's signature

The foregoing is an accurate summary of the explanation which was made to the volunteer and the undersigned witnessed the signature.

_6/27/74_
Date

_Mary L Carter_
Signature of auditor-witness

15. The principal diseases studied at the MRU were Malaria (118), Cholera (55), Shigella (34), Viral Diarrhea (31), Influenza (28), Typhoid (17), E. Coli (17), and Rhinovirus (16). The numbers in parentheses indicate the number of studies of that particular disease from January 1970 until the MRU was closed in 1976.

16. States in which some medical research was conducted on prisoner volunteers during at least some period of time after 1970 include Michigan, Montana, California, Texas, Indiana, Connecticut, Missouri, Oklahoma, Illinois, Florida, Georgia, Massachusetts, New Jersey, Ohio, Rhode Island, Nebraska, and Kentucky. Nontherapeutic biomedical research was conducted in state prisons in the following states in 1975: California, Indiana, Maryland, Michi-

gan, Montana, Texas, Virginia, Connecticut, and Massachusetts.

17. One such protocol dated January 15, 1972 included the following:
 C. USE OF VOLUNTEERS
 The Division of Infectious Diseases, University of Maryland School of Medicine has been involved in volunteer studies for the last 10 years. The majority of this work has been conducted at the Maryland House of Correction, Jessup. Utmost care is taken to insure that informed consent is obtained. A patient release form is signed and witnessed for each volunteer entered in a study. Each volunteer has been paid (originally at the request of the Superintendent of Prisons) $2 per day while he is hospitalized for an induced infectious disease. Following discharge from the hospi-

were periodic reviews by those federal agencies as well as by the Maryland Department of Health. The Warden of the MHC and other prison administrators were also kept generally informed. Additionally, the MRU studies were subject to continuous review and approval by the Human Volunteers Research Committee (HVRC) of the University of Maryland School of Medicine.

The HVRC was a multidisciplinary committee composed of physicians and non-physicians, including professors of law, social work, pharmacology, and psychology.[18] The HVRC had final review authority over all medical research on human subjects conducted by faculty members of the University of Maryland School of Medicine (not just the studies conducted at the MRU). The HVRC was responsible for protecting the rights of human subjects, making sure the risks to them were outweighed by the benefits of a proposed study, and assuring that the individual subject's consent had been appropriately obtained. Starting in 1973, the HVRC, in addition to preliminary review, required individuals conducting experiments on human subjects to file six-month reports and final reports describing progress, results, and unusual occurrences.

The HVRC was substantially more than a rubber stamp for research proposals by doctors. It was an integral part of the review process. The committee carefully reviewed proposed studies and took a very strict stand on the issue of informed consent. On November 6, 1973, Dr. Felix Heald, Chair-

man of HVRC, wrote to Dr. Hornick regarding his proposed research:

Your two protocols submitted to the Human Volunteers Research Committee on November 2, 1973, entitled "Clinical Evaluation of Experimental Live Influenza Vaccine" and "Evaluation of Wild Type Influenza B Virus in Man and the Protective Efficacy of Inactivated Monovalent B Virus Vaccine Against Homologous Wild Type Virus", stirred up a storm of protest.

The committee's view is that the consent form indicates the degree to which the investigator has thought about informed consent. The committee neither has the wish nor the time to personally monitor how any investigator in any given project carries out the informed consent. Therefore, the consent form indicates to the committee how much the investigator has thought about informed consent. The two consent forms on these two proposals were not only inaccurate but extremely sloppy. Further, they showed no evidence that any one had given any thought to informed consent in two highly vulnerable research groups.

The protocols which involved giving live influenza vaccines one to a group of institutionalized mentally retarded adults and the other study giving live virus to a group of prisoners [sic]. These are two very vulnerable groups and the committee is particularly concerned about your divisions's attitude toward informed con-

tal or at the time that he is on an outpatient type study smaller amounts of money is [sic] paid such as $1 for each bleeding or $2 for vaccine administration. It is recognized that this money may serve as an inducement but no mention of any money is made until the volunteer has consented to participate. Every attempt has been made to equip the present medical facility to handle all medical emergencies. Currently there are 6 male nurses that provide 24 hour coverage and at least 2 physicians are at the prison solely for support of the volunteer studies during the day. Rapid transportation to the University Hospital is available should more sophisticated medical support be needed. The program has been under the leadership of Dr. Theodore E. Woodward since its beginning. Our routine has always been to discuss potential protocols among the responsible investiga-

tors. Since 1966 protocols have been forwarded to the committee established by the Dean to oversee all volunteer projects. This committee is composed of senior members of various departments of the medical school who are not involved in our program. The new ward facility which was planned four years ago is now completed and provides a more comfortable environment for the volunteers.

18. In a memo dated January 24, 1972 from the HVRC to the faculty, the committee stated: "As a result of the need for broad representation, Mr. Goldberg, from the Law School, Mr. Janzen from the School of Social Work, and Doctor Ludlum from Cell Biology and Pharmacology were added to the Committee."

sent. Because of the urgency of these two protocols in relation to the impending flu virus, the committee allowed them temporary provisional approval.

I will be glad to discuss any of these matters with you in order to convey the seriousness with which the committee views sloppy consent forms.

On June 25, 1974, the HVRC wrote Dr. Hornick:

The Human Volunteers Research Committee met on June 21, 1974 and provisional approval was given to your project entitled "Immune Function in Man after Administration of Venezuelan Equine Encephalitis Vaccine, Live, Attenuated".

Your proposal was generally acceptable except there is one paragraph on page 5 which needs to be clarified. The sentence at issue is, "We will follow guidelines set forth in the new regulatory proposals for research in humans, published in the Federal Register on November 16, 1973." The committee would like clarification as to what the new regulatory proposals are that you intend to follow.

Secondly, the consent form as submitted to the committee was not in its proper order and the information indicating the nature of the experiment should flow consecutively and not be continued on a second page.

On May 16, 1975, the committee wrote to Dr. Hornick:

The Human Volunteers Research Committee met on May 16, 1975 and gave provisional approval to your project entitled "The antigenicity and Safety of Influenza Virus Vaccine, Bivalent Versus Commercially Available Bivalent Influenza Virus Vaccine and Placebo". However, before final approval can be given, the following changes should be made:

The committee feels that the purpose of the study should be stated. Also, the consent form should have a statement concerning the risks involved and a statement that this study is of no immediate benefit to the subject. In addition, the consent form has too much jargon. It should be in a simple language the patient can understand.

The minutes of the HVRC indicate the broad range of considerations of that committee and the diligence and care with which that committee considered informed consent and all details.[19]

In December 1971, HEW issued "The Institutional Guide to DHEW Policy on Protection of Human Subjects," DHEW Publication No. 72–102 (December 1, 1971), applicable to federally funded medical research. That publication addressed, among other matters, institutional review of projects (such as the review processes of the HVRC which predated that 1971 HEW guide) and informed consent. In 1973, HEW published a Notice of Proposed Rulemaking, 38 Fed. Reg. 27882 (October 9, 1973), which indicated HEW's intention to expand and codify its December 1, 1971 policy. In November 1973, HEW published a Draft of Proposed Policies and Procedures, prepared by a study group appointed by the National Institutes of Health, which focused on problems involving research on particular categories of human volunteers, including prisoners. 38 Fed.Reg. 31738 (November 16, 1973). That draft was published prior to final governmental review in recognition of the fact that it would provoke "debate and controversy" and in order to invite "early public comment and participation." 38 Fed. Reg. at 31738. The draft articulated the rationale for using prisoners and observed (at 31743):

V. *Prisoners*—A. *Policy considerations.* Clinical research often requires the participation of normal volunteers; for example, in the early stages of drug or vaccine evaluation. Sometimes, the need for standardization certain variables, or for monitoring responses over an extended period of time, requires that the subjects of research remain in a controlled environment for the duration of the project. Prisoners may be especially suitable subjects for such studies, since, unlike most adults, they can donate their time to research at virtually no cost to

**19.** The minutes for April 5, 1974 are typical and are attached to this opinion as Appendix A. They reveal the committee's concerns.

themselves. However, the special status of prisoners requires that they have special protection when they participate in research.

While there is no legal or moral objection to the participation of normal volunteers in research, there are problems surrounding the participation of volunteers who are confined in an institution. Many aspects of institutional life may influence a decision to participate; the extent of that influence might amount to coercion, whether it is intended or not. Where there are no opportunities for productive activity, research projects might offer relief from boredom. Where there are no opportunities for earning money, research projects offer a source of income. Where living conditions are unsatisfactory, research projects might offer a respite in the form of good food, comfortable bedding, and medical attention. While this is not necessarily wrong, the inducement (compared to the deprivation) might cause prisoners to offer to participate in research which would expose them to risks of pain or incapacity which, under normal circumstances, they would refuse. In addition, there is always the possibility that the prisoner will expect participation in research to be viewed favorably, and to his advantage, by prison authorities (on whom his other few privileges depend) and by the parole board (on whom his eventual release depends). This is especially true when the research involves behavior modification and may be termed "therapeutic" with respect to the prisoner. In such instances, participation inevitably carries with it the hope that a successful result will increase the subject's chances for parole. Thus, the inducement involved in therapeutic research might be extremely difficult to resist; and for this reason, special protection is necessary for prisoners participating in research whether or not the research is therapeutic.

Further HEW notices of proposed rulemaking were published in 1974, 39 Fed.Reg. 18914 (May 30, 1974), 39 Fed.Reg. 30648 (August 23, 1974), and in 1978, 43 Fed.Reg. 1049 (January 5, 1978), followed by published rules on November 16, 1978, 43 Fed.Reg. 53652, restricting research on prisoners (45 C.F.R. §§ 46.301–46.306). Permitted research involving prisoners was limited to the following (45 C.F.R. § 46.306):

(A) Study of the possible causes, effects, and processes of incarceration, and of criminal behavior, provided that the study presents no more than minimal risk and no more than inconvenience to the subjects;

(B) Study of prisons as institutional structures or of prisoners as incarcerated persons, provided that the study presents no more than minimal risk and no more than inconvenience to the subjects;

(C) Research on conditions particularly affecting prisoners as a class (for example, vaccine trials and other research on hepatitis which is much more prevalent in prisons than elsewhere; and research on social and psychological problems such as alcoholism, drug addiction and sexual assaults) provided that the study may proceed only after the Secretary has consulted with appropriate experts including experts in penology medicine and ethics, and published notice, in the Federal Register, of his intent to approve such research; or

(D) Research on practices, both innovative and accepted, which have the intent and reasonable probability of improving the health or well-being of the subject. In cases in which those studies require the assignment of prisoners in a manner consistent with protocols approved by the IRB to control groups which may not benefit from the research, the study may proceed only after the Secretary has consulted with appropriate experts, including experts in penology medicine and ethics, and published notice, in the Federal Register, of his intent to approve such research.

(b) Except as provided in paragraph (a) of this section, biomedical or behavioral research conducted or supported by DHEW shall not involve prisoners as subjects.

In August 1974, HEW noted that it had received 47 responses, both favorable and unfavorable, concerning the proposed regulations and published the August 1974 notice of proposed rulemaking in order "to continue the public dialogue begun in November 1973 . . . ." 39 Fed.Reg. 30648, 30651 (August 23, 1974). There was in August 1974 no consensus on the use of prisoners for research purposes or the importance to be attributed to the institutional environmental factor. The dialogue continued through November 16, 1978 as indicated in the comments and responses published along with the final regulations. 43 Fed.Reg. 53652–53655.

The reasons for the limitations on prisoner participation in medical research were set forth in HEW's response to comments suggesting broader prisoner participation (43 Fed.Reg. at 53654):

Response : The Department is well aware of the past contributions of prison research, and of individual prisoners, acting as research subjects, to the general health and welfare of the Nation and of society as a whole. However, it finds that there are substantial reasons for prohibiting continuation of such research and does not find any demonstrable need for continuing such research except where, as provided in § 46.306, there is reason to believe that such research is necessarily concerned with prisons as institutions; prisoners as persons or as a class; or when the research has the intent and reasonable probability of improving the health and well-being of the subject (with the possible exception of control subjects, the use of which requires a more stringent review process).

The Department again notes that medical and medically related research:

—Has already been prohibited in all Federal prisons;

—Has been prohibited in eight States;

—Is conducted in only about seven of the States that either permit it or don't regulate it;

—And is not conducted in countries outside the United States.

In general, these prohibitions have been based on the demonstrable inequities of such research and on the questionable voluntariness of prisoner consent. Though in theory the benefits of such research are usually to society as a whole, prisoners included, only one segment of society, prisoners, is asked to accept the research risks. Even if prisoner consent is obtained, the circumstances of that consent in a confined, restrictive, unattractive and boring environment, raise questions as to the voluntary nature of that consent. In addition, other nations active in biomedical and behavioral research have been able to conduct investigations without involving prisoners. After considerable deliberation, the department has amended § 46.306(a)(2) so as to permit certain research on conditions particularly affecting prisoners as a class and research on practices which have the intent and reasonable probability of improving the health and well-being of the subjects, even though some subjects who are in a control group may not benefit directly from the research. The review process required before these kinds of research may be approved is more stringent, and includes the requirement that the Secretary consult appropriate experts, including experts in penology, medicine and ethics, and published in the Federal Register his intent to approve such research.

Comment : One respondent felt that the allowable research on practices as stated in § 46.306(a)(2)(C) of the proposed regulations, § 46.306(a)(2)(D) of the final regulations, appears to allow a broader range of "therapeutic" research than the preamble would lead one to expect. The respondent noted that there is not even a "minimal risk" ceiling on this type of research.

Response: The Commission would permit research on practices which have the intent and reasonable probability of improving the health or well-being of the subject when a prisoner benefits from a practice, no limit on the inherent, medically related risk was intended. [Sic] The

Commission felt that a research subject should not be deprived of health benefits (even experimental ones) simply because the subject is a prisoner. The Department agrees.

While this debate was taking place, numerous articles concerning the medical research at the MHC were accepted and published in medical journals. Over 100 articles concerning that research have been published since 1971, 45 since 1974. The articles appeared in such highly regarded journals as the New England Journal of Medicine and the Journal of Infectious Diseases. The acceptance of an article for publication apparently implies that the study discussed by the article is viewed as having been conducted in accordance with medically ethical standards. No article concerning a study at the MHC was ever refused because the study had been conducted in an unethical manner.

The published articles contain descriptions, some more extensive than others, of the consent process. Many of the descriptions were set forth under the subheading "Materials and Methods." A typical explanation stated:

> Studies of induced cholera in man were begun in April 1969 at the Maryland House of Correction, Jessup, Maryland. Approval for these studies was obtained from the University of Maryland Committee for Volunteer Research and the Cholera Advisory Committee of the National Institutes of Health. Inmate volunteers were asked to participate after the nature of the study had been explained to them. No coercion was used; each man was informed of his right to withdraw at any time.[20]

The level of pay for the prisoners was not generally mentioned in the medical journal articles; nor was there discussion of the prison environment. A number of articles, however, published during that same period, criticized the use of prisoners. While Dr. Hornick was aware of the ethical problems involved in performing medical research on prisoner volunteers, he did not know of any legal restraints prior to the final HEW regulations being published in 1978.

Dr. Hornick confronted the general ethical question of informed consent by prisoner volunteers on several occasions. On one occasion, the American Civil Liberties Union (ACLU) was invited to submit its comments on the consent forms being used, but the ACLU did not respond.

From time to time, Baltimore newspapers and Baltimore television stations gave coverage to the MRU experiments. On one occasion, the British Broadcasting Company filmed a sequence involving consent procedures used at the MRU. In Spring 1974, members of the ACLU were invited to tour and did tour the MRU. In 1973 Senator Kennedy and other members of the Senate Subcommittee on Health, at the time that subcommittee was holding hearings on the use of prisoner volunteers, were invited to visit the MRU but were seemingly unable to do so in view of their large volume of work and the number of similar prisoner research projects then ongoing. Dr. Hornick also consulted legal counsel concerning the validity of the informed consent being obtained and the possibility of bringing a test court case on the issue. In 1974 when concern over the use of prisoner volunteers mounted, Dr. Hornick, along with state prison administrators and Warden Williams. at the MHC, considered holding a public seminar on that topic.[21] That seminar,

20. Response of Man to Infection with Vibrio Cholerae. I. Clinical Serologic, and Bacteriologic Responses to a Known Inoculum, 129 Journal of Infectious Diseases 45 (January 1974).

21. Dr. Hornick's proposal for the meeting stated, in part:

A. UTILIZATION OF INMATES AS VOLUNTEERS

In the last 13 years a large number of volunteers have [Sic] been employed in the course of our investigations. Numerous administrative changes have occurred at the prison which affect our program. The current warden (the fourth throughout our stay at the prison) continues to be cooperative and interested in the program. However, he feels somewhat exposed in his position and decision to allow the studies to continue. Despite our efforts to sup-

however, never received final administrative approval and was not held.

## Constitutional Issues

### A. Cruel and Unusual Punishment

Plaintiffs contend that the poor prison conditions, idleness, and high level of pay relative to other prison jobs render the prisoners' participation in the studies conducted in the MRU coerced and in violation of their Eighth and Fourteenth Amendment rights.

The tests as to whether defendants' conduct subjected plaintiffs to cruel and unusual punishment or deprived plaintiffs of substantive due process are well established. In *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), Mr. Justice Marshall wrote concerning cruel and unusual punishment:

> The history of the constitutional prohibition of "cruel and unusual punishments" has been recounted at length in prior opinions of the Court and need not be repeated here. See, e. g., *Gregg v. Georgia,* 428 U.S. 153, 169–173 [96 S.Ct. 2909, 49 L.Ed.2d 859] (1976) (joint opinion of STEWART, POWELL, and STE-

VENS, JJ. (hereinafter joint opinion)); see also Granucci, Nor Cruel and Unusual Punishment Inflicted: The Original Meaning, 57 Calif.L.Rev. 839 (1969). It suffices to note that the primary concern of the drafters was to proscribe "torture[s]" and other "barbar[ous]" methods of punishment. *Id.,* at 842. Accordingly, this Court first applied the Eighth Amendment by comparing challenged methods of execution to concededly inhuman techniques of punishment. See *Wilkerson v. Utah,* 99 U.S. 130, 136 [25 L.Ed. 345] (1879) ("[I]t is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment . . ."); *In re Kemmler,* 136 U.S. 436, 447 [10 S.Ct. 930, 34 L.Ed. 519] (1890) ("Punishments are cruel when they involve torture or a lingering death . . .").

> Our more recent cases, however, have held that the Amendment proscribes more than physically barbarous punishments. See, e. g., *Gregg v. Georgia, supra* [428 U.S.] at 171 [96 S.Ct. 2909] (joint opinion); *Trop v. Dulles,* 356 U.S. 86,

---

port his position, such as assurances from the Office of the State Department of Health and the Superintendent of Prisons for Maryland, the Warden remains concerned. Because of this a meeting is planned for late 1974. Numerous state officials will be invited; i. e., State Department of Health, Attorney General, Superintendent of Prisons, as well as other interested individuals including chaplains, representatives of the Civil Liberties Union, sociologists, Department of Defense and NIH administrators and probably inmates. The purpose of this meeting will be to attempt to present the program (again) to this group and to try to attain some feeling of the group as to the future of inmate participation in properly supervised medical research. The new regulatory proposals published in the Federal Register on November 16, 1973, will be presented as the latest form of guidelines that will be followed by our group. We obviously feel this is an important program, unique in its scope and aims and worthy of continuation. By getting a group together to discuss inmate volunteerism, we hope to improve communication so that a better understanding can be achieved between the scientific and public communities.

At the present time inmates at the Maryland House of Correction continue to volunteer for

our projects but not in the numbers as previously. One reason for this has been the insistance by the prison officials that only unemployed inmates participate. Those with jobs will lose them if they are hospitalized. They can be on out-patient type of studies (vaccine administration) but will lose their job as noted if admitted. This has cut down the available number of inmates by half, approximately 700 men instead of 1500. Furthermore, there are inmates who feel that volunteering for a study is "not the thing to do", and some of the men relate any study to the Tuskegee Syphilis study. Attempts to improve the communication gap at the prison are underway. No attempt has been made to increase the amount of money paid to inmates (remains at $2/day) or to promise any benefit pertaining to parole or reduction of sentence. We feel strongly that these are unethical considerations and have no place in the recruitment of volunteers. Despite this decrease in the number of volunteers, significant studies have been conducted and those involved in enteric research will be presented here.
R. Hornick, "Pathogenesis, Detection, Prevention and Treatment of Infectious Diseases of Military Importance," Annual Report for 1973.

100–101 [78 S.Ct. 590, 2 L.Ed.2d 630] (1958); *Weems v. United States,* 217 U.S. 349, 373 [30 S.Ct. 544, 54 L.Ed. 793] (1910). The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . ," *Jackson v. Bishop,* 404 F.2d 571, 579 (CA8 1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles, supra* [356 U.S.] at 101 [78 S.Ct. 590]; see also *Gregg v. Georgia, supra* [428 U.S.] at 172–173 [96 S.Ct. 2909] (joint opinion); *Weems v. United States, supra* [217 U.S.] at 378 [30 S.Ct. 544], or which "involve the unnecessary and wanton infliction of pain," *Gregg v. Georgia, supra* [428 U.S.] at 173 [96 S.Ct. 2909] (joint opinion); see also *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 463 [67 S.Ct. 673, 91 L.Ed. 422] (1947); *Wilkerson v. Utah, supra* [99 U.S.] at 136.

A violation of substantive due process occurs when the acts of the defendants "shock the conscience" of mankind. *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952). *See generally Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). None of the actions of the defendants herein rises to the levels described in *Estelle* or *Rochin.* That is true despite the fact that certain of the conditions which existed at the MHC during the time period involved have been held unconstitutional, *Johnson v. Levine, supra,* and that as many as one-third of the prisoners was idle at certain given times. Medical research studies offered at least a partial escape from those conditions since the MRU provided a clean, less-restrictive environment, and those who took part in its experiments were paid more than were prisoners generally except in a few other prison jobs. Additionally, some volunteers who did not live in the MRU and who had other jobs were able to earn money from both endeav-

ors. The prisoners testified (and the doctors did not contest) that prisoners volunteered principally because of the money inducement and because they also hoped that their participation in the MRU would influence their chances for parole. While prisoner volunteers were told, either as a matter of course or upon a question being raised, that participation in the MRU program would have no impact on parole, "hope springs eternal in the human breast" [21A] and almost surely so did in the breast of each volunteer at the MRU. Nevertheless, it is to be noted that while some of the plaintiffs have stated that parole was never raised as a subject and that they were not told that participation would not affect parole, no prisoner has stated that parole was ever promised to any volunteer or that any volunteer was ever told that his parole would be facilitated through participation in the MRU. Additionally, the testimony of the prisoners indicates that they understood that they were free to withdraw from the studies at any time and that indeed some of them did withdraw for various reasons. Some prisoners participated only in out-patient studies and withdrew upon learning that a study would be in-patient; some stopped participating after 1972 when they apparently risked loss of their jobs or cells if they became in-patients.

The doctors made diligent, continuing efforts orally to inform the prisoner volunteers concerning the various studies. They did not simply rely on a written consent form. They also made it clear to the inmates that the latter were free to withdraw at any time. Prisoners participating in studies were regularly and carefully examined and any volunteer who became ill received prompt, high-grade medical attention.

Accordingly, nothing in defendants' conduct of these studies is "incompatible with evolving standards of decency" nor "shocks the conscience" of mankind. That does not mean that there is not strong reason to question or disapprove of the use of prison inmates for research purposes. The issue of

21A. A. Pope, An Essay on Man, Epistle I, line 95.

informed consent is a most thorny one. Informed consent consists of two elements: information and voluntariness. There is no question that the prisoner volunteers were informed. Each doctor who testified detailed the procedures already described to provide information to the applicants. Plaintiffs' allegation of coercion thus hinges on lack of voluntariness growing out of unconstitutional conditions such as overcrowding and other undesirable aspects of regular institutional life at the MHC. Those conditions may well have caused inmates to value even a few additional hours outside of their cells as worth the risk of participation in the MRU. That plus the high level of pay may have made such participation very attractive to certain inmates. Yet, while the level of pay was an inducement, some prisoners did not find it sufficiently attractive so as to be worth the risk of losing the right to return to their cells or their jobs. Further, there was always a shortage of volunteers. Only some 14 percent of all prisoners who went through the MHC during the years here involved participated in the medical studies. Thus, the program was hardly universally or overwhelmingly attractive to most inmates.

Plaintiffs have cited numerous cases for the proposition that in evaluating the voluntariness of a prisoner's actions, the impact of the totality of circumstances affecting his ability to make a decision must be carefully scrutinized.[22] Those cases involve coerced confessions, consents to search and the like, given in factual situations which do not in any way approximate the conditions under scrutiny herein. Some of those cases refer not only to oppressive physical environment but to repeated interrogations and in certain instances bodily abuses. They do not address the question of the constitutionality of offering a choice to an inmate to participate in a worthwhile but unpleasant activity which may be more attractive to him because of his environment. Prisoners at the MHC were not subject to physical abuse, or confined in segregated cells, or restricted to meagre diets, until they consented to participate in MRU studies. Prisoners were not pressured to participate. To the contrary, prisoners had a viable choice and, even after choosing to participate, had the option to withdraw from the medical studies. The defendant doctors, closely watched by the HVRC and other review committees, took the necessary measures to assure that the prisoners were exercising their free choice.

Other cases cited by the plaintiffs involve truly involuntary administration of drugs to prisoners or involuntary medical treatment of the civilly confined.[23] In all of those cases in which the courts found either Eighth Amendment or due process violations, the treatment either was done without the prisoner's consent or exceeded the consent given. Such is not the case here.

One case cited by plaintiffs which does require particular note is *Kaimowitz v. Department of Mental Health of the State of Michigan*, Civil Action No. 73–19434–AW, Circuit Court for Wayne County, 42 U.S. L.W. 101 (1973). In *Kaimowitz*, the issue was whether a involuntarily confined mental patient suffering from uncontrollable aggression could consent "to an innovative or experimental surgical procedure on the brain . . . [where] the procedure is designed to ameliorate [the anti-social] behavior." (Slip op. at 8). The court's opinion focused on the nature of psychosurgery,

22. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Brooks v. Florida*, 389 U.S. 413, 88 S.Ct. 541, 19 L.Ed.2d 643 (1961); *United States v. Koch*, 552 F.2d 1216 (7th Cir. 1977); *United States v. Clarke*, 499 F.2d 802 (4th Cir. 1974); *Grant v. Wainwright*, 496 F.2d 1043 (5th Cir. 1974); *Stidham v. Swenson*, 443 F.2d 1327 (8th Cir. 1971), *rev'd on other grounds and remanded*, 409 U.S. 224, 93 S.Ct. 359, 34 L.Ed.2d 431 (1972); *Townsend v. Henderson*, 405 F.2d 324 (6th Cir. 1968);

*Williams v. Peyton*, 404 F.2d 528 (4th Cir. 1968).

23. *Scott v. Plante*, 532 F.2d 939, 945–47 (3d Cir. 1976); *Runnels v. Rosendale*, 499 F.2d 733 (9th Cir. 1974); *Knecht v. Gillman*, 488 F.2d 1136 (8th Cir. 1973); *Mackey v. Procunier*, 477 F.2d 877 (9th Cir. 1973); *Bell v. Wayne County General Hospital at Eloise*, 384 F.Supp. 1085, 1099–1100, 1102 (E.D.Mich.1974).

its "experimental" status, the "substantial danger" it poses (slip op. at 16), and the "particularly vulnerable" position of the involuntarily confined mental patient (slip op. at 25).

The infectious diseases studied in the MRU were *non* therapeutic. In that sense, they would appear even more vulnerable to attack than the therapeutic surgery found wanting in *Kaimowitz*. But they did not involve the uncertainties inherent in experimental psychosurgery; neither were they "dangerous, intrusive, irreversible, and of uncertain benefit to the patient and society." (Slip op. at 20). Rather, they were well-known diseases for which readily-available, effective cures were easily administered. Dr. Hornick testified that he permitted his own daughter, while a college student, to engage in controlled contagious disease research under appropriately skilled medical direction, as a means of earning money through a part-time job. All of the doctors testified to the almost complete lack of danger to life or to future health and stressed that only temporary illness and discomfort were involved. The record fully discloses that great care was taken to explain all of that to the inmates who indicated any desire to participate in the program.

Nor was there any connection between participation in the MRU and release from the MHC. In point of fact, those performing and administering the experiments in the MRU had absolutely no connection with the institutional release process except that, on occasion, an MRU doctor did write, upon an inmate's request, a letter to be included in the inmate's parole file about the latter's MRU participation. However, none of the MRU doctors seemingly received any feedback concerning the effect, if any, of any such letter. In addition, after a rather major general riot, several prisoners asked one or more doctors to write letters about those inmates' involvement in the MRU and, to the extent of those doctors' knowledge, the particular inmate's noninvolvement in the riot. None of such letters would appear to have overstepped appropriate boundaries.

In sum, though the MRU may have appeared attractive to some prisoners, the totality of the record fails to disclose any violation of the fundamental right of every person, including each inmate, to be free from undue coercion.

### B. Privacy

Plaintiffs' privacy claim is equally unfounded. With the exception of *Kaimowitz*, those cases which have considered invasion of privacy claims in the administration of drugs in a prison or civil confinement setting have focused upon involuntary treatments.[24] In *Kaimowitz*, the Court held that the experimental psychotherapy constituted an invasion of privacy because it interfered with mental processes protected by the First Amendment. No such concerns are present here. There is no evidence that the mental processes of any inmate-volunteer were adversely affected.

### C. Good Faith

 Assuming *arguendo* the existence of violations of plaintiffs' constitutional rights, plaintiffs still may not prevail. That is because a defendant in a 1983 case is entitled to the defense of good faith if he objectively and subjectively so acted. This Court finds that each of the defendants acted in good faith.

In *Procunier v. Navarette*, 434 U.S. 555, 561–63, 98 S.Ct. 855, 859–860, 55 L.Ed.2d 24 (1978), Mr. Justice White discussed the good faith defense and applied it to prison officials:

Although the Court has recognized that in enacting § 1983 Congress must have intended to expose state officials to damages liability in some circumstances, the section has been consistently construed as not intending wholesale revocation of the

24. *Scott v. Plante*, 532 F.2d 939, 945–46 n. 9 (3d Cir. 1976); *Runnels v. Rosendale*, 499 F.2d 733, 735 (9th Cir. 1974); *Mackey v. Procunier*, 477 F.2d 877 (9th Cir. 1973); *Bell v. Wayne County*

General Hospital at Eloise, 384 F.Supp. 1085, 1100 (E.D.Mich.1974). *See* L. Tribe, American Constitutional Law § 15–8.

common-law immunity afforded government officials. Legislators, judges, and prosecutors have been held absolutely immune from liability for damages under § 1983. *Tenney v. Brandhove,* 341 U.S. 367 [71 S.Ct. 783, 95 L.Ed. 1019] (1951); *Pierson v. Ray,* 386 U.S. 547 [87 S.Ct. 1213, 18 L.Ed.2d 288] (1967); *Imbler v. Pachtman,* 424 U.S. 409 [96 S.Ct. 984, 47 L.Ed.2d 128] (1976). Only a qualified immunity from damages is available to a state Governor, a president of a state university, and officers and members of a state national guard. *Scheuer v. Rhodes, supra* [416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90]. The same is true of local school board members, *Wood v. Strickland, supra* [420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214]; of the superintendent of a state hospital, *O'Connor v. Donaldson,* 422 U.S. 563 [155 S.Ct. 2486, 45 L.Ed.2d 396] (1975); and of policemen, *Pierson v. Ray, supra;* see *Imbler v. Pachtman, supra,* [424 U.S.] at 418–419 [96 S.Ct. 989].

We agree with petitioners that as prison officials and officers, they were not absolutely immune from liability in this § 1983 damages suit and could rely only on the qualified immunity described in *Scheuer v. Rhodes, supra,* and *Wood v. Strickland, supra. Scheuer* declared:

> "[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." 416 U.S., at 247–248 [94 S.Ct., at 1692].

We further held in *Wood v. Strickland,* that "if the work of the schools is to go forward," there must be a degree of immunity so that "public school officials understand that action taken in the good-faith fulfillment of their responsibilities and within the bounds of reason under all the circumstances will not be punished and that they need not exercise their discretion with undue timidity." 420 U.S., at 321 [95 S.Ct., at 1000]. This degree of immunity would be unavailable, however, if the official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." *Id.,* at 322, 95 S.Ct. at 1001. The official cannot be expected to predict the future course of constitutional law, *ibid.; Pierson v. Ray, supra,* 386 U.S., at 557 [87 S.Ct., at 1219], but he will not be shielded from liability if he acts "with such disregard of the [plaintiff's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." 420 U.S., at 322 [95 S.Ct., at 1001].

Under the first part of the *Wood v. Strickland* rule, the immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm. Petitioners claim that in 1971 and 1972 when the conduct involved in this case took place there was no established First Amendment right protecting the mailing privileges of state prisoners and that hence there was no such federal right about which they should have known. We are in essential agreement with petitioners in this respect and also agree that they were entitled to judgment as a matter of law.

[Footnote omitted.]

The burden of proving a good faith defense is upon defendants. *McCray v. Burrell,* 516 F.2d 357 (4th Cir. 1975) (en banc), *cert. denied,* 426 U.S. 471, 96 S.Ct. 2640, 48

L.Ed.2d 788 (1976). The good·faith defense is subdivided into two elements: objective and subjective good faith. In *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), Mr. Justice White, writing for himself and four other members of the Court, stated (at 321–22, 95 S.Ct. at 1001) (emphases in original):

> The disagreement between the Court of Appeals and the District Court over the immunity standard in this case has been put in terms of an *"objective"* versus a *"subjective"* test of good faith. As we see it, the appropriate standard necessarily contains *elements of both.* The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of *settled, indisputable law* on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice.[25]

Objective good faith on the part of each of the defendants was present in this case. The legal status of the impact of prison environment on the prisoners' ability to give voluntary consent to medical experiments being conducted on them as volunteers had certainly not reached an adverse settled basis during the period of operation of the MRU. Indeed, the within case is the first case instituted in any court in the United States aimed at testing the legality of nontherapeutic medical experiments on prisoners.[26] The HEW Guidelines for the Protection of Human Subjects (1971) mentioned a special concern for "those subjects in groups with limited civil freedom . . . [which] include prisoners." (at 2). That same publication mandated that "[c]ompensation to volunteers should never be such as to constitute an undue inducement." What is "undue" was not defined. Prior to 1973 there was infrequent mention and little, if any, public debate over conditions of confinement as an element to be considered in evaluating consents. Efforts were begun by HEW in 1973 to develop regulations focusing upon prisoner subjects. Comments received were on both sides of the issue. Not until November 1978, some two months prior to the trial of this case and some two years after the closing of the MRU, were negative, restrictive-type regulations promulgated.

During the course of the MRU experiments, all proposals for studies were subject to review by the interdisciplinary HVRC and governmental agencies providing funding. Beginning in 1974, ongoing studies were subject to periodic and final review by the HVRC. Those review committees knew the level of pay and never questioned it as too seductive; the committees knew further that the studies were to be conducted using prisoner volunteers and never raised the issue of the prison environment.

Medical journals accepted articles describing the results of the experiments and their methods. Experiments were being simultaneously conducted in prisons in numerous states, and the fact that some states discontinued medical experiment programs while others continued similar experiments only served to further the debate rather than to indicate the emergence of well-settled principle. To the contrary, throughout the period the MRU was in existence, there was no consensus regarding the importance to be attached to institutional conditions in evaluating a prisoner's consent to participate.

Plaintiffs, stressing the bad conditions prevailing at the MHC, contend that defendants should have been aware of such conditions and should have realized the impact of those conditions upon any prisoner's voluntary participation. However, the defendant doctors testified to a shortage of volunteers and to a preference for out-patient studies, especially after 1972 when a

---

**25.** *See Thompson v. Anderson,* 447 F.Supp. 584 (D.Md.1977).

**26.** Statement of Matthew L. Myers, Hearings on House Bill 3606, Subcommittee on Courts, Civil Liberties, and the Administration of Justice, Committee on the Judiciary, House of Representatives, 94th Cong., 1st Sess. (1977). Mr. Myers is one of plaintiffs' counsel in this case and, throughout most of the proceedings in this Court, was plaintiffs' principal advocate.

prisoner participating in an in-patient study risked loss of his job and/or his cell. As the law was unsettled as to the importance of conditions of confinement generally—and perhaps still is (see Bell v. Wolfish, supra), it is not reasonable to conclude that the defendants should have had the foresight to single out one institution in which conditions vitiated consent. Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). There is no basis to conclude that the defendants knew or should reasonably have known that their conduct of the medical experiments violated plaintiffs' constitutional rights. Rather, the record compels the conclusion that the defendants reasonably concluded that they were not violating any legal principle, constitutional or other.

As to subjective good faith, plaintiffs challenge only the subjective good faith of Dr. Richard Hornick and Warden Ralph Williams. In so doing, they point to several alleged inconsistencies in the testimony of Dr. Hornick. On direct examination, Dr. Hornick testified to the effect that he did not believe that the money paid to prisoner volunteers was so great an inducement or the conditions of confinement so oppressive as to invalidate the consents given by the prisoners. On cross-examination, plaintiffs' counsel elicited that in a Department of Army contract renewal application for a study of shigella vaccines [27] and similar renewal applications,[28] Dr. Hornick had written that "[i]t is recognized that this money may serve as an inducement but no mention of any money is made until the volunteer has consented to participation." [29] Dr. Hornick also testified on direct examination that prior to 1973 there was no discussion of prison conditions. On cross-examination, plaintiffs' counsel confronted Dr. Hornick with the fact that the minutes of the March 23, 1970 meeting of the Advisory Council on Human Trials,[30] at which meeting Dr. Hor-

nick was present, contained the following: "Food and living conditions for volunteers were formerly superior to other inmates. This is not necessarily true now because TV is in practically every cell [sic] and cells are air conditioned [sic]." Additionally, plaintiffs claim discrepancies in some of Dr. Hornick's statements relating to the question of parole, i. e., whether as part of the consent process there was a statement made to prisoners that parole would not be affected by participation or whether no statement was made regarding parole.

After considering the totality of Dr. Hornick's testimony and observing his demeanor on the witness stand, this Court entertains not the slightest doubt in the world about Dr. Hornick's truthfulness and integrity. Dr. Hornick did not state that he was not concerned about the problem of monetary compensation being an inducement to prisoner participation. To the contrary, he testified that money was clearly a factor in many prisoners' decisions to volunteer and that he was concerned with the ethical questions involving compensation. Dr. Hornick compared civilian experiments conducted at the University of Maryland Hospital where compensation was much higher, noting that many volunteers were interested in the money.[31] He further stated that while he recognized that the $2.00 per day for prisoner volunteers was an inducement, he did not consider it undue inducement. In any event, the pay level for MRU participation was certainly known from the start throughout the MHC and no matter when the doctors discussed that subject with prisoners, the prisoners throughout the institution of course knew about it—from the first time after it was mentioned—and pay was quite often the first subject broached by an interested prisoner.

The fact that Dr. Hornick did not remember the issue of conditions of confinement

---

27. DA–17–67–C–7057, January 15, 1971.

28. See, e. g., Plaintiffs' Ex. 34.

29. Plaintiffs' Ex. 31 at 220; see also Minutes, Advisory Council on Human Trials, March 23, 1970, Plaintiffs' Ex. 29 at 3.

30. Plaintiffs' Ex. 29.

31. Dr. Hornick also testified that at one time the ACLU had complained that prisoners received less than civilian volunteers and that the pay to prisoners should be raised.

being broached at some time prior to the time when that issue started to raise serious debate hardly undermines his good faith belief that the conditions of confinement did not render consent involuntary.[32] Dr. Hornick repeatedly emphasized his concern for medical ethics and his belief that the MRU complied with relevant ethical standards. Furthermore, whether or not Dr. Hornick or any other doctors made a firm practice of either stating that a prisoner's parole would not be affected by participation in the MRU or of remaining silent on the issue of parole, the testimony in this case reveals that if the parole issue was raised by in inmate's question, the institutional policy was recounted.

Dr. Hornick was a totally credible, impressive witness with an outstanding record. At all times during the MRU's operation, he entertained a good faith subjective believe that all relevant legal and ethical standards were being met and that the MRU was obtaining voluntary informed consents from the prisoner volunteers.

Plaintiffs' challenge to Warden Williams' subjective good faith rests on the fact that the Warden failed to take any action in 1972 when he received a lengthy memorandum prepared by an assistant warden in which certain possible ethical problems involving the MRU were discussed.

The fact that Warden Williams chose not to act reflected not a lack of subjective good faith but merely a difference of opinion. Warden Williams testified that he did not believe that any inmate was in any way coerced to participate and that he at no time received any complaints about participation from prisoners. While Warden Williams admittedly did not know the details of the consent process and did not do a study of the pay of inmates prior to and during operation of the MRU, that does not affect his subjective belief that proper consents were being obtained and that there was no coercion.

Defendants have proven their good faith defense by far more than a preponderance of the evidence. Plaintiffs have not proven any violations of their constitutional rights. Some persons may prefer that if society's needs require that human beings be subjects of non-dangerous, temporarily disabling, unpleasant medical experiments, such subjects should either be chosen by lot or at least not come solely from the ranks of the socially or economically underprivileged, including prison inmates. Such preference, however, even if valid, does not add up to a presently established constitutional absolute. Accordingly, judgments will be entered for defendants.

## APPENDIX

### UNIVERSITY OF MARYLAND

### SCHOOL OF MEDICINE

Baltimore, Maryland 21201

### HUMAN VOLUNTEERS RESEARCH COMMITTEE

### FRIDAY, APRIL 5, 1974

PRESENT: Dr. Balis, Dr. Calia, Mr. Goldberg, Dr. Heald, Dr. Hobbins, Dr. Krise, Dr. LoGerfo, Dr. Parisi, Dr. Ludlum, Dr. Slawson

ABSENT: Dr. Walker, Mr. Handlir

*Protocols for Subsequent Review*

1. "Renal Concentrating Ability in Patients on Treatment with Lithium Carbonate"—Dr. Bruce Hamilton—The committee suggested to Dr. Hamilton that the patients be screened for coronary artery disease and renal disease. It is obvious that patients with either coronary artery disease or renal disease should be excluded from the study—Approval Given.

---

**32.** The 1970 statement refers to air conditioning and color television in every cell. It appears that Dr. Hornick, when testifying on direct examination, had a mistaken recollection. Such experiences, as trial judges are wont to tell juries, are hardly uncommon experiences in the lives of most of us, including judges. Dr. Hornick was familiar with the other parts of the prison (outside the MRU), had eaten in the prison dining room, participated in recreation with prisoners, and was very well acquainted with MHC conditions.

2. "A Trial of Lithium Carbonate and Demeclocycline in the treatment· of the Syndrome of Inappropriate A.D.H.—Dr. Bruce Hamilton—Provisional approval given pending revision of the consent form to indicate the toxicity of the two drugs being used. The consent form should state that with the dosages given toxicity would not ordinarily be expected but are potentially possible.

3. "Propranolol in the Treatment of Normal Renin and High Renin Hypertensions"—Dr. Bruce Hamilton—Provisional approval was given pending revision of consent form to indicate to the patient that the newly discovered treatment for his hypertension will be randomized among the drugs included in the.protocol. This shouldn't be done in such a way that the research subject knows he is part of a randomized study.

4. "Affective Future Time Perspective of Suicidal Adolescents"—Jim Hynes, M.A.—Approval Given—However, the committee recommends that the consent form be altered so as not to guarantee confidentiality. Although we might institutionally be able to guarantee confidentiality, it is theoretically possible that the courts might subpoena records. Thus we could not guarantee other than institutional confidentiality. Secondly, the consent form should include a place for the subject to sign whenever appropriate.

5. "A Program for Newborn Streptococcal Surveillance"—Dr. Ellen Wald—Approval Given.

6. "Progesterone· Production and Its Placental Passage During Human Pregnancy"—Dr. Isadore Ances—Delayed until the next meeting in order to circulate original proposal to the committee.

7. "The Effects of Two Kinds of Pre-Training on Subsequent Brain Wave BioFeedback"—Dr. David A. Paskewitz—Approval Given.

8. "A Comparative Study of Chloromycetin and Clindamycin in treatment of susceptible anaerobic bacterial infections" —Frank Calia, M.D. and Richard B. Hornick, M.D.—Approval Given.

*Protocols for Initial Review*

1. "An Investigation of Familial Life Changes, Anxiety, and Protein Utilization in Hair Roots of Adolescent Girls"—M's Rita Bowdish Peterson—Provisional approval was given this project pending modification of the consent form. The consent form does not fully inform the patients as to what is being done and certain parts of it are much too technical and should be rewritten in such a way that it can be understood by a teenage girl. Also, there should be a line on the consent form for the girl to sign in addition to the parents' signature.

2. "Comparison of Digoxin Blood Levels Obtained with different Forms and Brands of Digoxin"—Dr. Richard B. Hornick and William B. Woodward, M.D.—Approval Given.

3. "Evoked Response Audiometry Using Complex Sounds"—Dr. Charles Suter—Approval Given.

4. "Study of T Lymphocytes, B Lymphocytes and Macrophages in Hyperplastic and Neoplastic Lymph Nodes"—Moon Lee Shin, M.D.—Approval Given—No consent form is necessary for this study.

5. "The Cardiac Effect of Sudden Withdrawal of Propranolol in Healthy Subjects"—Yu-Chen Lee, M.D.—Provisional approval was given this project pending revision of the consent form which is inadequate. It does not give fully informed consent as to what is being done in the project and what are the side effects of the drug. This must be described in the consent form in such a way that the patient is fully informed about the experimental procedure. ·

Further, the committee wishes to call to the attention of the investigator what they consider a defect in the design of the project. Since the subjects utilized are otherwise healthy, the committee would suggest that a period of

observation be recorded in order to gather baseline data prior to the initiation of propranolol therapy. The committee feels that the physiological observations being made of this study should be done during this time period as well as post-treatment in order to maximize the information pertaining to this particular research project.

6. "Mechanical Assistance to the Failing Heart"—Dr. Safuh Attar—The use of the mechanical assistance after open-heart surgery is common enough in a number of university hospitals. Under these circumstances; that is, its use after open-heart surgery as a life-saving procedure, it should not be viewed as a research project at this time. The committee took the view that this was a standard procedure in certain sophisticated centers and permission need not be obtained.

However, the use of mechanical assistance as proposed for cardiogenic shock secondary to myocardial infarction does constitute a research proposal and obviously informed consent should be obtained from the next of kin.

Before approval can be given this project, the committee would like to have from Dr. Attar a clear definition of how shock is to be defined. How will it be treated before mechanical assistance is used?

7. "Further Studies on the Pathogenesis of Hypocalcemia During Magnesium Deficiency in Man"—Dr. L. G. Martin and Dr. Thomas B. Conner—Approval Given.

8. "A Proposal for the Study of Nutrition by Examining Hair Roots in Healthy and Chronically Ill Adolescents"—Dr. Ruth Ashman and Dr. Warren P. Klam—Approval was given; however, the consent form should be modified so that both the parent and the patient can sign the consent form.

9. "Correlation of Serum Progesterone and Estrogen with the Maturation Index"—Dr. Norman Dubin—Approval Given.

10. "Detection of Immunodeficiency Among Allergic Children"—Shih-Wen Huang, M.D.—Approval Given.

*Six-Month Interim Progress Report*

The Committee reviewed these reports and will send reminder letters to the principal investigators that the final reports or requests for continuation are due to the committee:

a. "Clinical Prediction and Treatment of Episodic Violence"—Dr. Russell R. Monroe

b. "Effect of Maternal Hormone Therapy on Cardiac Development and Lung Maturation" Charlotte Ferencz, M.D.

c. "Study on Rickettsial Diseases"—Charles L. Wisseman, Jr., M.D.

d. "Dipyridamole-Aspirin Study Coordinating Center"—Dr. Christian Klimt"

e. "Clinical and Epidemiological Studies on Rickettsial Infections in Ethiopia"—Charles L. Wisseman, Jr., M.D.

Dr. Robert Slawson accepted the position of Vice-Chairman of The Human Volunteers Research Committee, and will act in the Chairman's absence or when the Chairman has protocols up before the committee.

The Jessup prison research has been a source of considerable anguish for the committee, and we feel that we should tour the facilities with the following aims in mind:

1. To note whether there is adequate medical back-up.

2. To speak to individual prisoners and find out their attitude about being research subjects, whether there is undue coercion, etc.

3. To Look at the issues around minority groups being used as research subjects, particularly to see if there is any evidence of racial bias.

The scheduling will be done through Mr. Handlir.

ORDER

The Motion filed by plaintiffs on July 12, 1979 is hereby granted in view of this

228

Court's inability to file its final opinion promptly after June 30, 1979 as it had expected to do. Accordingly, the judgments entered on June 30, 1979 are hereby withdrawn. Judgments are today hereby entered for defendants in each and all of these cases for the reasons set forth in an opinion filed today. It is so ORDERED, this 21st day of July, 1979.